Exhibit A

AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

# United States District Court

| SOUTHERN | | DISTRICT OF | | NEW YORK |
|---|---|---|---|---|

Zurcaled International, Inc.

### SUMMONS IN A CIVIL CASE

**V.**

CASE NUMBER:

Scientific Games Corporation, Scientific Games
International, Inc. and Scientific Games
Corporation International, Inc.

## 07 CIV. 4066

### JUDGE SAND

TO: (Name and address of defendant)

Scientific Games Corporation
750 Lexington Avenue, 25th Floor
New York, New York 10022

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Bartels & Feureisen, LLP
925 Westchester Avenue, Suite 304
White Plains, New York 10604

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**J. MICHAEL McMAHON**

MAY 2 4 2007

CLERK

DATE

(BY) DEPUTY CLERK

AO 440  (Rev. 10/93)  Summons In a Civil Action -SDNY  WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served: _____
_____

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐  Returned unexecuted: _____
_____
_____
_____

☐  Other *(specify)*: _____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

      I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                  Date                                Signature of Server

_____
                                  Address of Server

(1)    As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ZURCALED INTERNATIONAL, INC.,

                                        Plaintiff,

                    -against-

SCIENTIFIC GAMES CORPORATION, SCIENTIFIC
GAMES INTERNATIONAL, INC. and SCIENTIFIC
GAMES CORPORATION INTERNATIONAL, INC.,

                                        Defendant.

-------------------------------------------------------------x

FILED
CASE NO. MAY 2 4 2007
USDC WP SDNY

**COMPLAINT**

**07 CIV. 4066**

ECF CASE

JURY TRIAL JUDGE SAND
DEMANDED

      Zurcaled International, Inc. ("Zurcaled"), by its attorneys, Bartels & Feureisen, L.L.P.,

as and for its complaint against Scientific Games Corporation ("SGC"), Scientific Games

International, Inc. ("SGI") and Scientific Games Corporation International, Inc. ("SGCI"),

(individually and collectively referred to below as "Scientific Games"), alleges as follows:


### The Parties

     1.     At all times herein relevant, Zurcaled was, and still is, a corporation organized

and existing pursuant to the laws of the State of New Jersey, maintaining its principal place

of business in Miami Beach, Florida.

     2.     At all times herein relevant, SGC was, and still is, a corporation organized

and existing pursuant to the laws of the State of Delaware, maintaining its principal place of

business in the City and State of New York.

     3.     At all times herein relevant, SGI was, and still is, a corporation organized and

existing pursuant to the laws of the State of Delaware, maintaining its principal place of

business in the City and State of New York.

-1-

4.      At all times herein relevant, SGCI was, and still is, a corporation organized and existing pursuant to the laws of the State of Delaware, maintaining its principal place of business in the City and State of New York.

### Jurisdiction and Venue

5.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

6.      Upon information and belief, at all times relevant herein, SGC was authorized to do business in, was doing business in, and maintained an office for service of process located in, the State of New York.

7.      Upon information and belief, at all times relevant herein, SGI was authorized to do business in, was doing business in, and maintained an office for service of process located in, the State of New York.

8.      Upon information and belief, at all times relevant herein, SGCI was authorized to do business in, was doing business in, and maintained an office for service of process located in, the State of New York.

9.      The venue of this action is properly placed in this district pursuant to 28 U.S.C. § 1391(a) because defendants are subject to personal jurisdiction in this district.

### The Facts

10.      On or about December 10, 2003, Zurcaled and Scientific Games entered into a contract ("the Consulting Agreement"), which provided that Zurcaled would provide

-2-

consulting services to Scientific Games, "concerning [Scientific Games's] responding to a Request for Proposal for an online lottery/electronic public gaming network issued by the Commonwealth of Puerto Rico, Department of Treasury – Loteria Electronica ("Puerto Rico Lottery")."

11.    Annexed hereto as Exhibit "A" is a true and complete copy of the Consulting Agreement.

12.    Pursuant to paragraph 4B of the Consulting Agreement, Scientific Games is obligated to pay Zurcaled, "3.5% of all remuneration actually received by [Scientific Games] without deduction, by reason of all sales of online games (now known, or hereinafter developed) sold through the Puerto Rico Lottery network (excluding any remuneration received by [Scientific Games] from the production, distribution, sale, administration, validation and processing of instant tickets)."

13.    Pursuant to paragraph 4C of the Consulting Agreement, Scientific Games is obligated, "to pay [Zurcaled] for as long as [Scientific Games], or an affiliate of, or successor to [Scientific Games], continues to derive revenues from the Puerto Rico Lottery or any successor thereto, whether public or private."

14.    Pursuant to paragraph 4D of the Consulting Agreement, all compensation due to Zurcaled was, "fully earned by [Zurcaled] as of the date of the award of the Puerto Rico Lottery to [Scientific Games], notwithstanding that payment of such Compensation [was to be] payable at a later date."

15.    Pursuant to paragraph 4C of the Consulting Agreement, Scientific Games is obligated to, "provide [Zurcaled] with a statement setting forth by category, the calculation

of Compensation payable [under the Consulting Agreement] and all payments made thereon to date" ("Statements").

16.    On or about September 22, 2004, Scientific Games was awarded the Puerto Rico Lottery contract.

17.    Scientific Games continues to hold the Puerto Rico Lottery contract.

18.    Scientific Games has received, and will continue to receive, remuneration by reason of the sale of online games sold through the Puerto Rico Lottery network.

19.    Scientific Games has failed and refused to make any payments to Zurcaled as required by the Consulting Agreement.

20.    Scientific Games has failed and refused to provide Zurcaled with the Statements required by paragraph 4C of the Consulting Agreement.

21.    Scientific Games's breach of its obligations under the Consulting Agreement was, and continues to be, malicious, vindictive, willful, wanton and reckless.

## AS AND FOR A FIRST CAUSE OF ACTION

22.    Zurcaled repeats, reiterates and realleges all of the foregoing paragraphs as if more fully set forth herein.

23.    The Consulting Agreement is a valid and enforceable contract.

24.    Zurcaled has complied with all of the terms of the Consulting Agreement and has performed all conditions precedent to Scientific Games' obligation to make payment pursuant to the Consulting Agreement and all conditions precedent to Scientific Games' obligation to make payment pursuant to the Consulting Agreement have occurred.

-4-

25.    Scientific Games has breached the Consulting Agreement by reason of Scientific Games's failure and refusal to pay those sums owed Zurcaled under the terms of the Consulting Agreement.

26.    By reason of the foregoing, Zurcaled has been damaged in an amount to be determined at the time of trial, but an amount that, under any circumstances, exceeds $75,000.00, exclusive of interest and costs.

## AS AND FOR A SECOND CAUSE OF ACTION

27.    Zurcaled repeats, reiterates and realleges all of the foregoing paragraphs as if more fully set forth herein.

28.    The Consulting Agreement is a valid and enforceable contract.

29.    Zurcaled has complied with all of the terms of the Consulting Agreement and has performed all conditions precedent to Scientific Games' obligation to provide Statements pursuant to the Consulting Agreement and all conditions precedent to Scientific Games' obligation to provide Statements to the Consulting Agreement have occurred.

30.    Zurcaled is without knowledge of the amount of remuneration received by Scientific Games and its affiliates and/or successors by reason of all sales of online games sold through the Puerto Rico Lottery network, or the amount due Zurcaled under the terms of the Consulting Agreement, and cannot obtain such knowledge or ascertain that amount without an accounting.

31.    Zurcaled is entitled to an accounting of all remuneration actually received by Scientific Games and its affiliates and/or successors by reason of all sales of online games sold through the Puerto Rico Lottery network.

## AS AND FOR A THIRD CAUSE OF ACTION

32.    Zurcaled repeats, reiterates and realleges all of the foregoing paragraphs as if more fully set forth herein.

33.    An actual controversy exists between Zurcaled and Scientific Games regarding Scientific Games's continuing obligation to make payment to Zurcaled under the terms of the Consulting Agreement.

34.    Zurcaled is entitled to a judgment declaring and adjudging that, from and after the last date for which damages are assessed against Scientific Games on the first cause of action, Scientific Games is obligated to pay Zurcaled 3.5% of all remuneration actually received by Scientific Games and its affiliates and/or successors by reason of all sales of online games sold through the Puerto Rico Lottery network, and for as long as Scientific Games, or an affiliate of, or successor to, Scientific Games, continues to derive revenues from the Puerto Rico Lottery or any successor thereto, whether public or private.

35.    Zurcaled lacks an adequate remedy at law.


WHEREFORE,  Zurcaled demands judgment against Scientific Games, as follows:

(1)    On the first cause of action, for compensatory damages for breach of contract in the amount of 3.5% of all remuneration actually received by Scientific Games and its affiliates and/or successors by reason of all sales of online games sold through the Puerto Rico Lottery network from the date of the awarding of the Puerto Rico Lottery contract to Scientific Games through the date of judgment;

(2)    On the second cause of action, directing Scientific Games to provide Zurcaled with an accounting of all remuneration actually received by Scientific Games and its affiliates and/or successors by reason of all sales of online games sold through the Puerto Rico Lottery network from the date of the awarding of the Puerto Rico Lottery contract to Scientific Games through the date of judgment;

(3)    On the third cause of action, for an Order declaring and adjudging that, from and after the last date for which damages are assessed against Scientific Games on the first cause of action, Scientific Games is obligated to pay Zurcaled 3.5% of all remuneration actually received by Scientific Games and its affiliates and/or successors by reason of all sales of online games sold through the Puerto Rico Lottery network since the awarding of the Puerto Rico Lottery contract to Scientific Games, and for as long as Scientific Games, or an affiliate of, or successor to, Scientific Games, continues to derive revenues from the Puerto Rico Lottery, or any successor thereto, whether public or private;

(4)    For punitive damages in the amount of $5,000,000.00; and

(5)    For such other, further and different relief as this Court deems just and proper, including interest, costs, disbursements and attorneys' fees.

Dated:  New York, New York
        May 10, 2007

BARTELS & FEUREISEN, L.L.P.

By: _____
    David Feureisen (DF 0774)

    Attorneys for Plaintiff
    925 Westchester Avenue, Suite 304
    White Plains, New York 10604
    (914) 681-7175

-7-

Exhibit A to the Complaint

## CONSULTING AGREEMENT

AGREEMENT dated December 10, 2003 by and between Scientific Games Corporation International, Inc. ("Company"), having an office at 750 Lexington Avenue, 25th Floor, New York, New York, 10022, and Zurcaled International, Inc. ("Consultant"), having an office at 5025 Collins Avenue, Miami Beach, FL. 33140.

In consideration of the mutual covenants contained herein, the parties agree as follows:

1.      Upon the terms and conditions hereinafter set forth, Consultant, as an independent contractor, shall perform, on a part-time basis, consulting services ("Services") concerning Company's responding to a Request For Proposal ("RFP") for an online lottery/electronic public gaming network issued by the Commonwealth of Puerto Rico, Department of Treasury - - Loteria Electronica ("Puerto Rico Lottery"). Consultant shall provide Services commencing on  the date hereof and terminating on award of the RFP or cessation of the Company's  bidding for the Puerto Rico Lottery ("Exclusive Period") for any reason.

2.      The precise Services of Consultant may be designated or assigned from time to time at the direction of the President or other officer of Company, and all of the Services to be rendered hereunder by Consultant shall at all times be subject to the direction and supervision of such persons.  Consultant's Services will be exclusive, so that Consultant will not be free to render similar services in Puerto Rico, to other persons or entities during the Exclusive Period and any period  for which Consultant is receiving "Compensation". During the Exclusive Period and thereafter, Consultant will not publish, disseminate or inappropriately use Confidential Information (defined herein) of, or concerning, Company learned while performing Services for Company. Unless consented to by Company, the Services will be performed by Ernesto J. De La Cruz.

3.      Consultant shall use its commercially  reasonable efforts, skills, and abilities in the performance of the Services hereunder and to promote the interests of Company.

4.      Consultant shall be paid as follows:

A.      No payment shall be made unless and until Company is chosen as the winning bidder for the Puerto Rico Lottery.

B.      Company shall only pay Consultant 3.5% of all  remuneration actually received by Company ("Compensation"), without deduction, by reason of all sales of online games (now known, or hereinafter developed) sold through the Puerto Rico Lottery network (excluding any remuneration received by Company from the production, distribution, sale, administration, validation and processing of  instant tickets).

1

C.      Payment to Consultant of Compensation shall be made by Company on the 10th day of each month ("Monthly Compensation Payment"). The Monthly Compensation Payment shall include all Compensation due and owing Consultant from payments received by Company in the previous month. With each Monthly Compensation Payment, Company shall provide Consultant with a statement setting forth by category, the calculation of Compensation payable hereunder and all payments made thereon to date. Company shall continue to pay Consultant Compensation for as long as Company, or an affiliate of, or successor to Company, continues to derive revenues from the Puerto Rico Lottery or any successor thereto, whether public or private. Without limiting the foregoing, Company shall pay Consultant Compensation from revenues derived by Company from the contract resulting from the award of the RFP and any extensions, renewals or modifications thereof.

D.      All Compensation to be paid to Consultant hereunder shall be fully earned by Consultant as of the date of the award of the Puerto Rico Lottery to Company, notwithstanding that payment of such Compensation shall be payable at a later date. No subsequent breach of the Agreement by Consultant, expiration or termination of the Agreement (except only as provided in Section 16) or, death of Ernesto J. De La Cruz, shall effect Consultant's right to the payment of Compensation.

E.      All Compensation shall be paid to Consultant in the same form of currency as received by Company for the online lottery/electronic public gaming services provided in Puerto Rico.

5.      Consultant shall be responsible for all expenses in connection with the performance of the Services.

6.      Consultant will keep Company informed of developments related to the RFP in Puerto Rico including, the lottery and gaming industries in Puerto Rico, the legal and/or administrative matters affecting Company's business interests and any other relevant information.

7.      (a)      Consultant will not, either directly or indirectly, use for his own benefit or for the benefit of any of its officers, directors, employees, agents or shareholders ("Third Parties") disclose or make known to any person or company, any Confidential Information (defined below) which becomes known to/by Consultant or Third Parties in connection with work performed hereunder. All such Confidential Information shall be the sole and exclusive property of Company. This section shall survive termination of this Agreement.

(b)      As used herein, the term "Confidential Information" means and includes, but is not limited to, any confidential or proprietary information, trade secrets, know-how, data, inventions, discoveries, processes, drawings, notes, instructions, business dealings or plans or the like of Company or any affiliate of Company or any of its customers or vendors clearly marked as such, provided such material is not already in the public domain.

2

8.    Consultant is not granted any right or authority to assume or create any obligation or liability, express or implied, on Company's behalf, or to bind Company in any manner or thing whatsoever.

9.    The Agreement of Consultant to render Services hereunder shall not be assignable or transferable by Consultant provided, however, Consultant may assign or transfer its entitlement to Compensation, subject to Section 15. .

10.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and/or assigns.  In the event of the death of Ernesto J. De La Cruz this Agreement shall be binding upon and shall inure to the benefit of his heirs.  With respect to Company, this Agreement shall also be binding upon any entity who acquires by asset, stock purchase or otherwise, the rights and interests, tangible or intangible, to the revenue derived from the Puerto Rico Lottery or such other online lottery system in Puerto Rico.  Notwithstanding any such assignment, sale or transfer, Company shall remain liable to Consultant for the payment of Compensation as provided in this Agreement.

11.    Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and sent by certified or registered mail, return receipt requested, or its international equivalent, to the addresses stated above.

12.    The parties hereto will not disclose the existence of this Agreement, nor its substance, nor any of its terms or conditions, to any person or entity, either generally or specifically, and will not publicize or use the Agreement or the fact that it was made for any purpose whatsoever, except as necessary to advise their respective agents and representatives and to conduct business in the regular and ordinary course or in connection with disclosures to regulators, financial institutions and potential investors or as reasonably required in the conduct of business.

13.    This Agreement shall be construed in accordance with the internal laws of New York.

14.    This instrument contains the entire Agreement between the parties.  It may not be changed, modified, extended or renewed except by an agreement in writing executed by Company and Consultant.

15.    All rights and restrictions contained in this Agreement may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws and are intended to be limited to the extent necessary so that they will not render this Agreement illegal, invalid, or unenforceable.  If any term of this Agreement shall be held to be illegal, invalid, or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect.

3

16.    i.    Consultant specifically acknowledges that Company is subject to the gaming and licensing requirements of various jurisdictions and is obliged to take reasonable efforts to determine the suitability of its business associates. Consultant agrees to cooperate fully with Company in providing it with any information, of whatever nature, that Company deems necessary or appropriate in assuring itself that Consultant possesses the good character, honesty, integrity, and reputation applicable to those engaged in the gaming industry ("Consultant Conduct") and specifically represents that there is nothing in Consultant's background, history, or reputation that would be deemed unsuitable under the standards applicable to the gaming industry. If, during the term of the contract, Company is notified by any regulatory agency that the conduct of business with Consultant will jeopardize Company's license or ability to be licensed because of improper Consultant Conduct,, this contract to provide Services shall terminate upon written notice by Company if a cure is not effected within sixty days of notice. Upon such termination and subject to Section 16. iii, Consultant shall not receive any further payments.

ii.    It shall be a breach of this Agreement if any gratuities shall be offered or given by the Consultant for the purposes of unlawfully influencing (a) a foreign government official or political party official or a candidate for foreign political office to assist Company in obtaining or retaining business in violation of the United States Foreign Corrupt Practices Act of 1977, or (b) any other person, under the laws of any relevant jurisdiction (collectively, "FCP Breach"). In addition to any other remedies which Company may have against the Consultant for such a breach, Company may terminate this Agreement forthwith and Consultant shall, subject to Section 16. iii, not receive any further payments.

iii.    In the event of termination of this Agreement by Company in accordance with the provisions of Section 16., Consultant may challenge such termination in a court of competent jurisdiction in the United States or Commonwealth of Puerto Rico ("Action"). If a final determination is rendered in the Action, that Consultant Conduct was proper or, not such as to warrant termination under Section 16.1 or, that there was not a FCP Breach by Consultant (Section 16. ii), then Consultant shall be awarded, and Company shall pay damages to Consultant, as follows: (i) All amounts payable, and to be paid Consultant pursuant to this Agreement and (ii) reasonable attorney's fees and expenses incurred by Consultant in the prosecution of the Action.

iv.    If Consultant commences the Action within sixty (60) days of the date of his notification of the termination of this Agreement under this Section 16 then in such event, Company shall escrow with its counsel in the Action in an interest bearing escrow account, all Compensation otherwise payable to Consultant, but for said termination ("Escrow Fund"). The Escrow Fund shall be maintained until a final determination is rendered in the Action and shall be paid to Consultant if the termination is deemed improper.

4

      v.    In the event Consultant's conduct under this Agreement becomes the subject of any investigation, regulatory proceeding or court action, Company shall provide Consultant with notice of same (simultaneous with Company's notice) and Consultant shall be provided an opportunity to appear and be heard.

      IN WITNESS WHEREOF, this Agreement has been duly executed this 10th day of May but as of the day and year first above written.

SCIENTIFIC GAMES INTERNATIONAL, INC.

By: _____

Name:

Title:

ZURCALED INTERNATIONAL, INC.

By: _____

Name:

Title:

5

Exhibit B

# SARETSKY KATZ DRANOFF & GLASS, L.L.P.

### 475 PARK AVENUE SOUTH
### NEW YORK, NEW YORK 10016

TELEPHONE (212) 973-9797
FACSIMILE (212) 973-0939

ALAN G. KATZ
akatz@skdglaw.com

ROCKLAND COUNTY OFFICE

450 PIERMONT AVENUE
PIERMONT, NEW YORK 10968

<u>**Via Federal Express and Certified Mail - Return Receipt Requested**</u>

March 10, 2005

Martin E. Schloss
Vice President, General Counsel and Secretary
Scientific Games Corporation
750 Lexington Avenue
New York, New York 10022

Dear Mr. Schloss:

This will respond to your letter of March 3, 2005. We represent Zurcaled International, Inc.

Following the embarrassment associated with Mr. Olasov's July 21, 2004 correspondence, prudence would dictate careful thought and analysis prior to embarking upon the same course of conduct. In Mexico, and now with regard to Puerto Rico, Scientific Games has acted in bad faith and is attempting to strong arm its way out of its clear and unequivocal contractual obligations. It is not a coincidence that on the eve of any potential payment becoming due and owing to Zurcaled, whether in Mexico or Puerto Rico, Scientific Games takes an untenable position in an attempt to avoid its financial obligations.

The excuse for your letter is that "there have been reoccurring allegations in the press and from various legislative sources that the contract was procured on the basis of questionable or illegal conduct of SCI Games' representatives or its agents". I wonder whether this information that you are getting is from the same source that advised you that Graciella De La Cruz was related to an official in Pronosticos? I can only assume that the information is coming from the same source or from a source of similar caliber, since we have been able to determine that there are no such allegations in the press and that there is no such questioning by legislative sources.

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

Martin E. Schloss
Vice President, General Counsel and Secretary
Scientific Games Corporation
March 10, 2005
Page 2

Does your information really exist or is it merely a ruse to avoid Scientific Games' contractual obligations or to further some other motive?  As a matter of human nature, I am sure there is some discussion concerning the procurement of the contract by Scientific Games, in that Scientific Games was not the low bidder.  Rather than casting stones at your consultant and employees, you should spend your time and effort congratulating them on the result given the fact that you were not the low bidder. Additional congratulations are also deserving for Zurcaled, in that Zurcaled was able to accomplish what it set out to do with Scientific Games, without leaving the King Kong size footprint that Mr. Potts was looking for.  One wonders if Mr. Potts has ever even set foot in Puerto Rico to confirm, deny or refute the allegations which your March 3rd letter contains or infers.  Please share with us Mr. Potts' inquiry, so that we can provide comment.

You have asked Zurcaled to cooperate in providing certain information you deem necessary to protect the Puerto Rico contract.  To the extent that you are operating in bad faith and intend to use this request as a basis to allege Zurcaled's breach of contract, I direct your attention to the fact that Zurcaled's compensation is fully earned as of the date of the award of the Puerto Rico lottery ...  and a subsequent breach of the Agreement does not affect its right to the payment of compensation.  Accordingly, should Zurcaled choose not to cooperate, payments under the Consulting Agreement are still due and owing.

Notwithstanding, under the slim chance that Scientific Games is operating in good faith, we encourage Scientific Games to set forth in writing any information they seek from Zurcaled.  At that time, Zurcaled will consider the questions and, where appropriate, respond accordingly.  If a follow up meeting is required, it will then be considered.

Scientific Games is due to go online on March 15, 2005.  Compensation to Zurcaled will be due soon thereafter.  Zurcaled fully expects to be compensated pursuant to the Consulting Agreement in a timely manner.  Should payment not be received timely, we will consider the March 3, 2005 letter to be an anticipatory breach of the Consulting Agreement and along with the failure make payment, Zurcaled will immediately seek resolution in the court of appropriate jurisdiction, whether it be in New York or Puerto Rico.  Of utmost importance to Zurcaled is the ability to maintain the high regard in which it is held in Latin America.  Accordingly, if the contract is breached by Scientific Games, Zurcaled will embark upon the defense of its reputation. Necessarily, Zurcaled will take the depositions of all those involved with Loteria

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

Martin E. Schloss
Vice President, General Counsel and Secretary
Scientific Games Corporation
March 10, 2005
Page 3

Electronica and the legislature for the purpose of unequivocally determining that
Zurcaled did not engage in improper conduct.

Similar to the manner in which I closed my July 29, 2004 letter to Mr. Olasov, we
believe that Scientific Games' continuing attack of Zurcaled is shortsighted.  Rather
than attacking Zurcaled, Zurcaled should be used to help maintain relations in Puerto
Rico, to help promote and expedite new lottery games and most importantly, to set the
background work necessary so that Scientific Games may maintain a presence in
Puerto Rico for a period of time that is longer than its initial contract.  Should you like to
put this relationship on the proper course, please call me to discuss.

Zurcaled International, Inc., hereby reserves all of its rights and remedies.

Very truly yours,

Alan G. Katz

AGK:mm

cc:    David M. Olasov
       Brown Raysman Millstein Felder & Steiner LLP
       900 Third Avenue
       New York, NY  10022

Exhibit C

## SARETSKY KATZ DRANOFF & GLASS, L.L.P.
### 475 PARK AVENUE SOUTH
### NEW YORK, NEW YORK 10016

TELEPHONE (212) 973-9797
FACSIMILE (212) 973-0939

ROCKLAND COUNTY OFFICE

450 PIERMONT AVENUE
PIERMONT, NEW YORK 10968

ALAN G. KATZ
akatz@skdglaw.com

By Federal Express

March 21, 2005

David M. Olasov, Esq.
Brown Raysman Millstein Felder & Steiner LLP
900 Third Avenue
New York, New York   10022

      Re:    Zurcaled International/Scientific Games

Dear David:

I would like to take this opportunity to summarize Zurcaled's position following our recent exchange of correspondence, the telephone discussions you and I have had and also, the telephone discussion that Larry Potts participated in.

Scientific Games has requested that Zurcaled answer questions posed by Mr. Potts pertaining to Zurcaled's conduct in Puerto Rico. Scientific Games has requested that such questioning be in person, that Zurcaled answer the questions under oath and that there be no parameters as to the limitation of such questions. Specifically, and without limitation, Scientific Games has requested that Zurcaled answer questions pertaining to the Services performed by it in Puerto Rico and with regard to same, Scientific Games has demanded that Zurcaled reveal its contacts utilized in this process. Scientific Games has explained that it requires the questioning of Zurcaled in this manner, to respond to/and investigate certain allegations made in Puerto Rico. At this time, the allegations appear to be surmise and conjecture and do not constitute any formal grievance or investigation by Lotteria Electronica, or any branch of the government in Puerto Rico.

In response to Scientific Games's request, I have advised you that Zurcaled believes that its duty to cooperate, if any, does not extend to the parameters requested by Scientific Games. Nonetheless, I have also advised that Zurcaled will cooperate in providing certain information to further Scientific Games's investigation of the "allegations." Zurcaled has offered to respond to Scientific Games's questioning as follows:

      i.     Zurcaled will respond to any particular allegation regarding its conduct in Puerto Rico and will state whether or not the allegations are true or false.

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

David M. Olasov, Esq.
March 21, 2005
Page -2-

      ii.    Zurcaled will provide Scientific Games, if questioned, with the details of the
             Services it performed for Scientific Games regarding the lottery in Puerto Rico.

Although we did not discuss this during our telephone conversations, Zurcaled has advised that it
will, if requested, provide all of the foregoing under oath.

However, as we discussed, the allegations that you have made known to us do not rise to the
level of a governmental inquiry or investigation and, in Zurcaled's opinion, represent the bad
faith, unsubstantiated statements of supporters of other bidders. Because of Zurcaled's desire to
protect its confidential and proprietary business/trade secrets, Zurcaled will not identify those
people it contacted in Puerto Rico. In addition, Zurcaled does not believe that the Consulting
Agreement requires the contrary. As I discussed with you, if the "allegations" do subsequently
rise to the level of government investigation or inquiry as contemplated in Paragraph 16 of the
Consulting Agreement, Zurcaled will take those steps necessary to protect itself and the contract
awarded to Scientific Games.

Zurcaled congratulates Scientific Games on its March 15th launch of the lottery in Puerto Rico.
Zurcaled wishes Scientific Games long-term success with the lottery and is hopeful that the
lottery will grow, not only as a result of Scientific Games's expertise, but also, the addition of
new games and the potential of a Powerball alliance. Based on our calculations, we believe that
the first payment under the Consulting Agreement is due to Zurcaled on or before April 10, 2005.
We look forward to Scientific Games's timely compliance with its payment obligations to
Zurcaled.

Should Scientific Games, through Terry Patterson, Steve McCarthy or such others, need
Zurcaled's assistance with any matter regarding Puerto Rico, please feel free to discuss same
directly with Mr. De La Cruz. Should there be need for any further discussion with regard to the
issues discussed in this letter or in our prior conversations or correspondence, please direct them
to me.

Zurcaled hereby reserves all of its rights and remedies.

                                Very truly yours,

                                Alan G. Katz

AGK/hw

Exhibit D

# SARETSKY KATZ DRANOFF & GLASS, L.L.P.

475 PARK AVENUE SOUTH
NEW YORK, NEW YORK 10016

TELEPHONE (212) 973-9797
FACSIMILE (212) 973-0939

ALAN G. KATZ
akatz@skdglaw.com

ROCKLAND COUNTY OFFICE

450 PIERMONT AVENUE
PIERMONT, NEW YORK 10968

**Via Federal Express**

April 12, 2005

David M. Olasov, Esq.
Brown Raysman Millstein Felder & Steiner LLP
900 Third Avenue
New York, New York   10022

Re:   Zurcaled International, Inc.

Dear Mr. Olasov:

We are receipt of your letter dated April 6, 2005.  Briefly:

1.    You and I did not discuss a meeting with "intermediaries".  What you and I did discuss, was an outing Mr. De La Cruz had on a boat with friends - - whom were not government officials, had no association with Lotteria Electronica and were not "decision-makers [or] other officials".  If you want to categorize them, you can simply say that they were private citizens, some of whom were from Puerto Rico.  Moreover, you should be aware that Scientific Games had prior knowledge of the "boat trip" and authorized same even though, prior to the excursion, Scientific Games was on notice that the identity of the travelers would not be revealed.

2.    An alleged breach of contract by Zurcaled, does not allow Scientific Games to withhold Zurcaled's compensation. Paragraph 4.D.  Furthermore, Zurcaled's obligation to provide "Services" ceased upon the award of the RFP.  Paragraph 1.

3.    Given the mandates of paragraphs 1 and 4.D., Zurcaled will treat the April 6th letter to be a notice of termination of the contract.  Such termination is improper since Scientific Games has not been notified by any regulatory agency that the conduct of business with Zurcaled will jeopardize Scientific Game's license or ability to be licensed because of Zurcaled's improper conduct.  Paragraph 16.i.

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

David M. Olasov, Esq.
Brown Raysman Millstein Felder & Steiner LLP
April 12, 2005
Page 2

     4.     Zurcaled considers Scientific Games' conduct calculating, willful and malicious.

     Please confirm to me that your firm will hold in escrow the monies due to Zurcaled under the Consulting Agreement. In this manner, we can avoid allegations of interference similar to those which you made pertaining to Mexico.

     For future correspondence, please note our correct address.

     Zurcaled hereby reserves all of its rights and remedies.

                      Very truly yours,

                      Alan G. Katz

AGK:mm

Exhibit E

**El Nuevo Día**                                        **Printable version**

## INVESTIGATION OF THREE COMPANIES ASPIRING TO OPERATE THE LOTTERY

EL NUEVO DÍA/BUSINESS

By Miguel Díaz Román
End.mdia22@elnuevodia.com

The three companies that submitted proposals to operate the point of sale system for the Electronic Lottery, which could mean an annual income of $2.3 million, are currently the target of an investigation by the Treasury Department to determine whether there is any truth behind the allegations of technical irregularities, influence peddling, and the payment of political contributions of which they have been accused.

The three companies are GTECH Holdings, which is the current operator of the point of sale system, Intralot, and Scientific Games. The Secretary of the Treasury, Juan Flores Galarza, disclosed that the three companies have been accused of some "ethical issues", which are being investigated by an assessment committee appointed to evaluate the proposals. Flores Galarza pointed out that the results of this investigation will bear upon the final decision to select the winning proposal. The selection could occur within the next few weeks.

He added that the committee has visited the United States and the countries where these companies have contracts to operate lotteries. Flores Galarza stated that as the lottery is a government-owned business, the committee met with the governmental authorities that had awarded them the contracts in order to learn about their experience and how they had evaluated these companies.

Flores Galarza pointed out that the three companies had the opportunity to defend themselves against "the allegations" lodged against them, at a preliminary hearing with the assessment committee. He stated that part of the investigation is being carried out by the company ROCM, which belongs to certified public accountant Carlos Cuevas. He said that in order to select the winning proposal the committee will receive a report on the companies from ROCM .

He added that as Secretary he will also participate in the selection of the wining proposal. Esteban Santiago, marketing director for the Electronic Lottery, pointed out that at the moment all three companies are on equal ground. News of alleged irregularities committed by these companies was published in the United States press as well as in Mexico and Brazil. Nevertheless, the firm that has been in the news the most is GTECH.

According to the New York Times, this company is under investigation in Brazil for allegedly making political contributions to members of the current president of Brazil's administration. Allegedly, as a result of these political contributions GETCH Holdings was granted an extension of its contract to operate the lottery.

Paul Vicens, spokesman of GTECH, stated that in Brazil the company was of the victim of an extortion attempt by government officials. He pointed out that at present the firm is cooperating with the investigation being carried out by the Brazilian government and that GETCH does not pay incentives or make political contributions to obtain contracts. He pointed out that in the last three years the company has been able to renew 63 contracts in USA and in other countries.

On the other hand, both Intralot and Scientific Games have questioned the renewal of the contract that GETCH executed for the Mexican lottery. Both companies suspect that GTECH lowered prices excessively in order to get the contract. But Vicens stated that Intralot and Scientific Games' allegations are "irresponsible" and that GETCH was awarded the contract in a fair bid. "Intralot was even disqualified because it did not comply with requirements", concluded Vicens.

Article:      607844
Date:        Monday, April 3, 2004
Title:        Investigation of three companies aspiring to operate the lottery

Print Date;   10/1/2004  11:07 47 AM



# Pesquisa a tres aspirantes a operar la Loto

EL NUEVO DIA / NEGOCIOS

Por: Miguel Díaz Román
End.mdiaz2@elnuevodia.com

**LAS TRES** empresas que presentaron propuestas para operar el sistema de puntos de venta de la Lotería Electrónica, que implica ingresos de $23 millones anuales, son actualmente objeto de una investigación de parte del Departamento de Hacienda para determinar la veracidad de alegadas irregularidades técnicas, venta de influencias y el pago de donativos políticos que pesan en su contra.

Las tres empresas son Gtech Holdings, que es el actual operador del sistema de puntos de venta, Intralot y Scientific Games. El secretario de Hacienda, Juan Flores Galarza, reveló que contra las tres empresas hay "señalamientos éticos", lo cuales son investigados por un comité evaluador que se designó para evaluar las propuestas. Flores Galarza destacó que el fruto de esa investigación pesará en la decisión final que se tome para seleccionar la propuesta. La selección podría ocurrir en las próximas semanas.

Agregó que el comité ha visitado los estados de los Estados Unidos y los países donde estas empresas tienen contratos para operar loterías. Flores Galarza sostuvo que debido a que la lotería es un negocio que pertenece a los gobiernos, el comité se reunió con los funcionarios gubernamentales que las contrataron para conocer su experiencia y la evaluación que hicieron de las empresas.

Flores Galarza señaló que las tres empresas tuvieron la oportunidad de defenderse sobre "las alegaciones" en su contra en una vista oral con el comité evaluador. Sostuvo que parte de la investigación la realiza la empresa ROCM, que pertenece al contador público autorizado Carlos Cuevas. Dijo que para la selección de la propuesta el comité recibirá un informe de ROCM sobre las empresas.

**AÑADIÓ QUE** como Secretario también participará en la selección de la propuesta. Esteban Santiago, director de mercadeo de la Lotería Electrónica, indicó que actualmente las tres empresas están en igualdad de condiciones. Tanto en la prensa de los Estados Unidos como en la prensa de México y Brasil se publicaron noticias sobre alegadas irregularidades cometidas por estas empresas. Sin embargo, la firma que más noticias ha generado es Gtech.

Según The New York Times, ésta es investigada en Brasil por el alegado pago de donaciones políticas a funcionarios de la actual administración del presidente de Brasil. Alegadamente, las donaciones políticas le permitieron a Gtech Holdings, obtener una extensión de su contrato para operar la lotería.

Paul Vicens, portavoz de Gtech, declaró que en Brasil la empresa fue objeto de un intento de extorsión de parte de funcionarios del Gobierno. Indicó que actualmente la firma coopera con la investigación que realiza el Gobierno de Brasil y que Gtech Holdings no tiene como norma pagar incentivos o donaciones políticas para obtener contratos. Señaló que en los pasados tres años la empresa la logrado renovar 63 contratos en EE.UU. y en otros países.

Por otra parte, tanto Intralot como Scientific Games han cuestionado la renovación del contrato que

obtuvo Gtech para la lotería de México. Ambas empresas sospechan que Gtech bajó los precios excesivamente para obtener el contrato. Pero Vicens dijo que las alegaciones de Intralot y de Scientific Games son "irresponsables" y que Gtech obtuvo el contrato en buena lid. "Incluso Intralot fue descalificada porque no cumplió con los requisitos", concluyó Vicens.

```
----------------------------------------
Articulo:      807844
Fecha:         lun, 5 de abril de 2004
Titulo:        Pesquisa a tres aspirantes a operar la Loto
----------------------------------------
Print Date:    10/1/2004 11:07.47 AM
----------------------------------------
```

## CERTIFICATION OF TRANSLATION

I, Renee Borio-Román, certify that I am fluent in both the English and the Spanish languages, that I have translated the attached Spanish document entitled "Pesquisa a tres aspirantes a operar la Loto", by Miguel Diaz Román, and certify that the translation is a true and correct English translation of the original.

Renee Borio-Román hereby declares, under the penalties of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on the $\underline{25}$ day of June 2007.

*Renee Borio-Roman*

Exhibit F

# ORIGINAL

## COMMONWEALTH OF PUERTO RICO

15[the] Legislative Assembly                                    1st Ordinary Session

### HOUSE OF REPRESENTATIVES

### House Resolution *1753*

May 6, 2005

Submitted by representative Del Valle Colón [signature]

Regarding

### RESOLUTION

To order the Puerto Rico's House of Representatives' Committees on Socioeconomic Development and Planning, and on Commerce and Industry to conduct an investigation with regard to complaints raised by business owners and the betting public concerning the alleged discomfort and losses supposedly caused by changes made to the technical and administrative functioning of the Electronic Lottery.

### PRELIMINARY RECITALS

On March 16, 2005 a change by which the company G-Tech was replaced by the company Scientific Games to act as supplier of on-line betting for the Electronic Lottery went into effect. In a letter on the Electronic Lottery's letterhead dated March 8, 2005, all vendors of this system were informed that the reason for the change of companies was to "update our technology and thus improve and broaden our services to the public and more specifically to our vendors."

If this change is really aimed at a projected technological innovation to improve the productivity of on-line bets, as could be interpreted, then some questions or mysteries concerning the reason for replacing G-Tech arise. How bad was G-Tech's performance to rule the company incompetent and unable to implement a more aggressive program that would generate substantial profits for the Electronic Lottery? At the same time, it could be asked what are the expectations, the "expertise", experience and competence of Scientific Games to develop this new technological concept for on-line bets?

-2-

Immediate reactions to this change already form part of the daily public conversation, especially in businesses where these Electronic Lottery machines are operated. Many of these business owners have protested what they have seen as a complication of the loto game, both for them as well as for part of the betting public.

Some cases have been mentioned in which the change has caused a decrease in this type of gambling. The public, who before the change was able to say the numbers that it wanted to play verbally, including the so-called "automatic bets", now has to fill out a data card or a form with ovals that must be filled in with a pencil to place their bets. This process has caused an evident discomfort on the part of the player, and according to the business owners, they suffer irremediably when the players choose to leave their stores without betting to avoid the trouble of having to fill out a form.

In consideration of the foregoing, there is a pressing need for the aforementioned permanent Committees of the House of Representatives to thoroughly investigate these complaints as well as the nature of the reason for the change in companies made by the Electronic Lottery.

**THE HOUSE OF REPRESENTATIVES OF PUERTO RICO RESOLVES:**

Section 1. — To order the Committees on Socioeconomic Development and Planning and on Commerce and Industry to conduct an investigation regarding the complaints of business owners and the betting public concerning the alleged existing discomfort and losses supposedly caused by changes made to the technological and administrative functioning of the Electric Lottery.

Section 2. - The aforementioned Committees shall submit a report with their findings, conclusions and recommendations to the House of Representatives before the end of this Ordinary Session.

Section 3.-This Resolution shall go into effect immediately following its approval.



ESTADO LIBRE ASOCIADO DE PUERTO RICO

15ta. Asamblea
Legislativa

1ra. Sesión
Ordinaria

## CÁMARA DE REPRESENTANTES

R. de la C. _1753_

6 de mayo de 2005

Presentada por el representante Del Valle Colón

Referida a

### RESOLUCIÓN

Para ordenar a las Comisiones de Desarrollo Socioeconómico y Planificación y de Comercio e Industria de la Cámara de Representantes de Puerto Rico a realizar una investigación en torno a las quejas levantadas por comerciantes y público apostador en torno al alegado malestar existente y pérdidas supuestamente ocasionadas por cambios realizados en el funcionamiento técnico y administrativo de la Lotería Electrónica.

### EXPOSICIÓN DE MOTIVOS

El 16 de marzo de 2005 se hizo efectivo un cambio mediante el cual se sustituyó la compañía G-Tech por la de Scientific Games para fungir como suplidor de jugadas en línea para la Lotería Electrónica. En una comunicación, con membrete de la Lotería Electrónica y fechada 8 de marzo de 2005, se informó a todos los vendedores de este sistema que la razón de ser del cambio de compañías efectuado fue "actualizar nuestra tecnología y así mejorar y ampliar nuestros servicios al público y específicamente aún más, a nuestros vendedores."

Si este cambio realmente obedece a una proyectada innovación tecnológica para mejorar la productividad de estas jugadas en línea, como podría interpretarse, entonces surgen unas interrogantes o incógnitas del por qué suplantar a G-Tech. Qué tan malo fue el desempeño de G-Tech, como para rendirlo incompetente e incapaz de poder implantar un programa más agresivo que genere cuantiosas ganancias para la Lotería Electrónica? Así también podría inquirirse cuáles son las expectativas, el "expertise", la experiencia y competencia de Scientific Games, para desarrollar este nuevo concepto tecnológico de las jugadas en línea?

-2-

Las reacciones inmediatas a este cambio ya forman parte de la conversación pública diaria, especialmente en los negocios o comercios donde operan estas máquinas de la Lotería Electrónica.  Muchos de estos comerciantes han levantado su voz de protesta por lo que consideran ha sido una complicación del juego de la loto, tanto para ellos como para una parte del público apostador.

Se mencionan algunos casos donde se ha producido una merma en este tipo de juego de azar. El público, que anteriormente anunciaba a viva voz los números que deseaba jugar, incluyendo las llamadas "automáticas", ahora se vé obligado a cumplimentar una especie de "data card" o forma con óvalos, los cuales deben ser oscurecidos o llenados a lápiz, para poder registrar sus apuestas.  Esto ha causado un malestar evidente en el apostador y, según reclaman los comerciantes, sus negocios se afectan irremediablemente cuando estos jugadores optan por marcharse del lugar, sin realizar sus apuestas, para evitar el trabajo que representa para ellos el tener que llenar estas formas.

En vista de lo expuesto, urge que las referidas comisiones permanentes de esta Cámara de Representantes investiguen a fondo tanto estas quejas, como la naturaleza o razón de ser del cambio de compañías llevado a cabo en la Lotería Electrónica.

## RESUÉLVESE POR LA CÁMARA DE REPRESENTANTES DE PUERTO RICO:

Sección 1.-Se ordena a las Comisiones de Desarrollo Socioeconómico y Planificación y de Comercio e Industria a realizar una investigación en torno a las quejas levantadas por comerciantes y público apostador en torno al alegado malestar existente y pérdidas supuestamente ocasionadas por cambios realizados en el funcionamiento técnico y administrativo de la Lotería Electrónica.

Sección 2.-Las referidas comisiones rendirán un informe conjunto a este Alto Cuerpo Legislativo, contentivo de hallazgos, conclusiones y recomendaciones, antes de que concluya la presente sesión ordinaria.

Sección 3.-Esta Resolución empezará a regir inmediatamente después de su aprobación.

## CERTIFICATION OF TRANSLATION

I, Renee Borio-Román, certify that I am fluent in both the English and the Spanish languages, that I have compared the attached Spanish document entitled R. del C. 1753, dated 6 de Mayo de 2005, 2005, with the English translation of House Resolution 1753, dated May 6, 2005, and certify that the translation is a true and correct English translation of the original House Resolution 1753.

RENEE BORIO-ROMÁN hereby declares, under the penalties of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on the 25 day of June 2007.

_____
Renee Borio-Román

NY #634073 v2

Exhibit G

(TEXT APPROVED IN FINAL VOTE BY THE HOUSE)
(JUNE 29,2005)

COMMONWEALTH OF PUERTO RICO

₁₅th Legislative Assembly                                    1ST Ordinary Session

# HOUSE OF REPRESENTATIVES

# House Resolution 2451

June 29, 2005

Submitted by Representative *Aponte Hernández*

Regarding the Internal Affairs Committee

# RESOLUTION

Ordering Puerto Rico's House of Representatives' Committees on Public Integrity and on Finance and Financial Affairs to conduct an investigation in regards to the process undertaken by the Treasury Department to reconfigure the operations of the Electronic Lottery and to put into effect the new system for the various games, and on the negative effects, if any exist, on the revenue generated by that activity for the Treasury, due to problems that allegedly they are confronting with its implementation.

## PRELIMINARY RECITALS

The Electronic Lottery was established by Law Number 10 of May 24, 1989, as amended, with the fundamental objective of generating additional revenue for the Government of Puerto Rico by promoting games that are sold through a computerized network with terminals all over the Island. The Electronic Lottery games are sold through vendors who have retail businesses and are in compliance with the law and its rules and regulations. These vendors derive a commission for the sales that the Electronic Lottery produces in their stores. The revenues generated by these sales are directed to the municipalities, to an elderly housing subsidy and to the General Fund. The Electronic Lottery has generated over a billion dollars in revenues for the State Treasury, constituting one of the most important and stable sources of income for the Government of Puerto Rico.

Until recently, the Electronic Lottery was operated by a one company, which with one contract, provided the equipment and the services related to its operation and also offered marketing and consulting services. The administration of on-line services and marketing by one

company was so successful that it was maintained under the administrations of Governors Rafael Hernández Colón, Pedro Rosselló and during the first years of Sila M. Calderón's administration. Nonetheless, despite the success achieved by the Electronic Lottery during the last fourteen (14) years, Governor Calderón administration decided, at the end of its term, to discontinue the successful administration of the services provided by one company.. In a process plagued by accusations of irregularities, the Treasury Department, led by CPA Juan Flores Galarza, divided the contract granting the operation of the different Electronic Lottery games to another company without performing any studies that could justify the change. There have also been accusations that once the strict tender process had been initiated and an announcement of the tender had been published, the rules of the game were changed in favor of a much more flexible RFP process without any valid explanation.

Publicly there have been complaints to the effect that the change in supplier for the Electronic Lottery has caused a deterioration in the efficiency, reputation and profits that this activity brings to the People of Puerto Rico. Furthermore, since the new company started to implement its game system there have been hundreds of complaints made by our citizens, including the vendors, regarding the complicated way of choosing the numbers they want to play, machines that are out of order and intermittent pauses in the functioning of the machines. This scenario contrasts with the 99 % operating efficiency reported in prior years of the Electronic Lottery's technological platform and with sales of more than $300 million dollars in the Fiscal year ended June 30, 2004.

The House of Representatives considers that the changes made and those that may be made to the operation of this important source of income for the Treasury should be evaluated thoroughly on a regular basis to avoid any instability in its administration or a loss in confidence in the same. Due to the impact that such a situation could cause to the revenues provided by the Electronic Lottery and to safeguard the integrity of the government's adjudication processes, it is imperative that the House of Representatives, in order to protect the best interests of the People of Puerto Rico, order an investigation regarding the selection process of the new entity operating the Electronic Lottery and the adverse effects, if any, that problems resulting from the implementation of the new betting system may have.

*THE HOUSE OF REPRESENTATIVES OF PUERTO RICO RESOLVES:*

1      Section I      To order the Committees on Public Integrity and on Finance and

2 Financial Affairs to conduct an investigation in regards to the process undertaken by the

3 Treasury Department to reconfigure the operations of the Electronic Lottery and to

4 put into effect the new system for the various games, and the negatives effects, if

*5* any exist, on the revenues generated by that activity for the Treasury. due to

6 problems that allegedly they are confronting with its implementation.

-3-

1      Section 2.- the Committees shall submit a final report

2  with their findings, conclusions and recommendations within sixty (60) days of the date of

3  approval of this Resolution

4      Section 3.- This Resolution shall go into effect immediately following its approval.

**(TEXTO DE APROBACION FINAL POR LA CAMARA)**
**(29 DE JUNIO DE 2005)**

ESTADO LIBRE ASOCIADO DE PUERTO RICO

15ta. Asamblea                                                                                      1ra. Sesión
    Legislativa                                                                                  Ordinaria

# CAMARA DE REPRESENTANTES

# R. de la C. 2451

29 DE JUNIO DE 2005

Presentada por el representante *Aponte Hernández*

Referida a la Comisión de Asuntos Internos

## RESOLUCION

Para ordenar a las comisiones de Integridad Pública, y de Hacienda y Asuntos Financieros de la
    Cámara de Representantes de Puerto Rico, a realizar una investigación en torno al proceso
    llevado a cabo por el Departamento de Hacienda para reconfigurar las operaciones de la
    Lotería Electrónica y poner en vigor el nuevo sistema para los diferentes juegos de azar, y
    los efectos negativos, si alguno, sobre los ingresos que genera esta actividad para el
    erario, debido a los problemas que alegadamente están enfrentando con su implantación.

## EXPOSICION DE MOTIVOS

La Lotería Electrónica se estableció mediante la Ley Núm. 10 de 24 de mayo de 1989,
según enmendada, con el objetivo primordial de generar ingresos adicionales para el Gobierno
de Puerto Rico a través de juegos que son vendidos mediante una red computadorizada de
terminales alrededor de la Isla.  Los juegos de la Lotería Electrónica se venden por conducto
de comerciantes que tengan un negocio al detal y cumplan con los requisitos establecidos por
la Ley y sus Reglamentos.  Estos derivan una comisión por las ventas de Lotería Electrónica
que produzcan en su negocio.  Los ingresos generados por dichas ventas se dirigen a los
municipios, a un subsidio para vivienda a envejecientes y al Fondo General.  La Lotería
Electrónica ha generado sobre mil millones de dólares en ingresos al Tesoro Estatal,
constituyendo una de las fuentes de ingreso más importantes y estables para el Gobierno de
Puerto Rico.

Hasta hace poco la Lotería Electrónica estuvo operada por una misma compañía que
bajo un sólo contrato, proveía el equipo y servicios relacionados para su operación y además,
ofrecía los servicios de asesoramiento en mercadeo.  La administración unitaria de servicios en

línea y mercadeo por una misma compañía fue tan exitoso que se mantuvo bajo las administraciones de los gobernadores Rafael Hernández Colón, Pedro Rosselló y los primeros años de Sila M. Calderón. Sin embargo, a pesar del éxito alcanzado por la Lotería Electrónica durante los pasados catorce (14) años, la Administración de la Ex-Gobernadora Calderón se empeñó al término de su mandato en descontinuar la exitosa administración unitaria de la misma. En un proceso plagado de denuncias sobre irregularidades, el Departamento de Hacienda, dirigido por el CPA Juan Flores Galarza, dividió el contrato otorgándole a otra compañía la operación de los distintos juegos de dicha Lotería sin haber realizado estudio alguno para justificar el cambio. También se ha denunciado que una vez iniciado el proceso estricto de subasta y de haberse publicado el anuncio de subasta se cambiaron las reglas del juego por un proceso de RFP ("Request for Proposals") mucho más flexible sin ninguna explicación válida.

Públicamente se han hecho señalamientos a los efectos de que el cambio de suplidor para la Lotería Electrónica ha provocado un deterioro en la eficiencia, reputación y beneficios que brinda esta actividad al Pueblo de Puerto Rico. Más aún, desde el momento que la nueva compañía comenzó a implantar su sistema de juegos ha habido quejas de cientos de nuestros ciudadanos, incluyendo a los comerciantes, por la forma complicada de seleccionar los números, por las máquinas fuera de servicio y por las intermitentes pausas en el funcionamiento de las mismas. Este escenario contrasta con la eficiencia operativa de un 99% reportada para la plataforma tecnológica de la Lotería Electrónica en años anteriores, y con las ventas generadas de más de $300 millones en el año fiscal que concluyó el 30 de junio de 2004.

La Cámara de Representantes considera que los cambios realizados y aquellos que se puedan hacer en las operaciones de esta importante fuente de ingresos para el erario, deben ser evaluados con regularidad y detenimiento para evitar la desestabilización de su administración o la pérdida de la confianza en la misma. Debido al impacto que puede causar esta situación en los recaudos y para salvaguardar la integridad de los procesos de adjudicación del Gobierno, es imperativo que este Cuerpo, en aras de salvaguardar los mejores intereses del Pueblo de Puerto Rico, ordene una investigación sobre el proceso de selección de la nueva entidad que opera la Lotería Electrónica y los efectos adversos, si alguno, que puedan provocar los problemas surgidos en la implantación del nuevo sistema de juegos.

*RESUELVESE POR LA CAMARA DE REPRESENTANTES DE PUERTO RICO:*

1    Sección 1.-Se ordena a las comisiones de Integridad Pública, y de Hacienda y Asuntos

2    Financieros de la Cámara de Representantes de Puerto Rico, a realizar una investigación en torno

3    al proceso llevado a cabo por el Departamento de Hacienda para reconfigurar las operaciones de

4    la Lotería Electrónica y poner en vigor el nuevo sistema para los diferentes juegos de azar, y los

5    efectos negativos, si alguno, sobre los ingresos que genera esta actividad para el erario, debido a

6    los problemas que alegadamente están enfrentando con su implantación.

3

1       Sección 2.-Las comisiones deberán someter un informe final conjunto con sus hallazgos,

2    conclusiones y recomendaciones, dentro del término de sesenta (60) días contados a partir de la

3    fecha de aprobación de esta Resolución.

4       Sección 3.-Esta Resolución comenzará a regir inmediatamente después de su aprobación.

## CERTIFICATION OF TRANSLATION

I, Renee Borio-Román, certify that I am fluent in both the English and the Spanish languages, that I have compared the attached Spanish document entitled R. del C. 2451, dated 29 de Junio de 2005, with the English translation of House Resolution 2451, dated June 29, 2005, and certify that the translation is a true and correct English translation of the original House Resolution 2451.

RENEE BORIO-ROMÁN hereby declares, under the penalties of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on the 25 day of June 2007.

Renee Borio-Román

Exhibit H

COMMONWEALTH OF PUERTO RICO

15TH Legislative
Assembly

1ST Regular
Session

## SENATE OF PUERTO RICO

## SENATE RESOLUTION 462

April 5, 2005

Submitted by Senator Garriga Picó and Padilla Alvelo

Regarding the Financial Affairs Committee

# RESOLUTION

Ordering the Senate of Puerto Rico's Financial Affairs Committee to conduct an investigation regarding the new system to operate the various games of the Electronic Lottery taking into account the problems that were reported in the media regarding the negative effects, if any exist, that these problems may have on the revenues generated by this activity for the Government of Puerto Rico.

## PRELIMINARY RECITALS

During the last 14 years, the Electronic Lottery has been successful in Puerto Rico and in fiscal year 2003-04, it contributed by reaching levels of revenue for the Treasury of Puerto Rico of $122 millions annually, which represented more than $2.3 million dollars weekly for the benefit of the people of Puerto Rico.

The games identified with the Electronic Lottery are totally dependent on an adequate and efficient computerized system that allows for continuous communication with more than 1,900 game terminals located in retail stores all over the Island. In the past, the Electronic Lottery has had a technological platform that reported a 99.95% operating efficiency and achieved sales up to $348 million dollars in the fiscal year ended June 30, 2004. Nonetheless, it has been reported in a local newspaper that the Electronic Lottery could be facing problems during the conversion to a new electronic lottery system.

This has led to constant complaints from customers regarding the complicated way of selecting the numbers, out-of-service terminals and interruptions in the operations of the same.

THE SENATE OF PUERTO RICO RESOLVES:

Section 1.- To order the Financial Affairs Committee of the Senate of Puerto Rico to

conduct an investigation regarding the operation of the new electronic system of the lottery and to determine the impact, if any, that this change to a new operating system of the Electronic Lottery could have on the revenues of the Government of Puerto Rico.

Section 2.- The findings and recommendations of this investigation must be completed in the next forty-five (45) days, following approval of this Resolution.

Section 3.- A copy of this investigation with its recommendations shall be sent to the Secretary of the Treasury and the Director of the Electronic Lottery.

Section 4.- This Resolution shall go into effect immediately following its approval.

ESTADO LIBRE ASOCIADO DE PUERTO RICO

15 <sup>ta</sup> Asamblea                                                    1 <sup>ra</sup> Sesión
Legislativa                                                                     Ordinaria

## SENADO DE PUERTO RICO

# R. del S. 462

5 de abril de 2005

Presentada por el señor *Garriga Picó y la señora Padilla Alvelo*

Referida a

# RESOLUCION

Para ordenar a la Comisión de Hacienda del Senado de Puerto Rico que realice una investigación sobre el nuevo sistema para operar los diferentes juegos de azar de la Lotería Electrónica tomando en cuenta los problemas dados a conocer en los medios comunicación sobre y los efectos negativos, si alguno, que estos problemas pudieran tener sobre los ingresos que genera esta actividad para el Gobierno de Puerto Rico.

## EXPOSICION DE MOTIVOS

Durante los últimos 14 años, la lotería electrónica ha sido exitosa en Puerto Rico y en el año fiscal 2003-04, contribuyó en alcanzar niveles de recaudación para el fisco del Gobierno de Puerto Rico ascendentes a $122 millones anuales, lo que representó más de $2.3 millones de dólares semanales en beneficio de todos los puertorriqueños.

Los juegos identificados con la Lotería Electrónica dependen totalmente de un adecuado y eficiente sistema mecanizado que permita la comunicación no interrumpida de más de 1,900 terminales de juegos ubicados en locales comerciales alrededor de toda la isla. La Lotería Electrónica ha tenido en el pasado una plataforma tecnológica que reportaba un 99.95% de eficiencia operativa y se lograron ventas de hasta $348 millones en el año fiscal que concluyó el 30 de junio de 2004. Sin embargo, se ha reseñado en un rotativo del país que la Lotería Electrónica pudiera estar confrontando problemas para comenzar a operar un nuevo sistema electrónico de lotería.

Esto ha provocado incesantes quejas de los clientes por la forma complicada de seleccionar los números, por las máquinas fuera de servicio y por las intermitentes pausas en el funcionamiento de las mismas.

## RESUELVESE POR EL SENADO DE PUERTO RICO:

Sección 1 - Ordenar a la Comisión de Hacienda del Senado de Puerto Rico, que realice

una investigación sobre las operaciones de un nuevo sistema electrónico de lotería y determinar

el impacto, si alguno, que el cambio de sistema de operaciones de la Lotería Electrónica pudiera tener sobre los recaudos del Gobierno de Puerto Rico.

Sección 2 –La investigación en sus hallazgos y recomendaciones debe estar completarse en los próximos cuarenta y cinco (45) días, una vez aprobada la Resolución.

Sección 3 –Se le enviará copia de la investigación y sus recomendaciones al Secretario de Hacienda y al Director de la Lotería Electrónica.

Sección 4 – Esta resolución comenzará a regir inmediatamente después de su aprobación.

## CERTIFICATION OF TRANSLATION

I, Renee Borio-Román, certify that I am fluent in both the English and the Spanish languages, that I have compared the attached Spanish document entitled R. del S. 462, dated 5 abril de 2005, with the English translation of Senate Resolution 462, and certify that the translation is a true and correct English translation of the original Senate Resolution 462.

RENEE BORIO-ROMÁN hereby declares, under the penalties of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on the 25 day of June 2007.


_____
Renee Borio-Román

Exhibit I



**SCIENTIFIC GAMES**

March 3rd, 2005

Martin E. Schloss
Vice President, General Counsel and Secretary

**Via Federal Express**

Mr. Ernesto de la Cruz
Zurcaled International, Inc.
5025 Collins Avenue
Miami, Florida 33140

Re: Consulting Agreement dated December, 2003

Dear Mr. de la Cruz:

Reference is made to the consulting agreement between Scientific Games International, Inc. ("SciGames") and Zurcaled International, Inc. ("Zurcaled"). As you know, SciGames was awarded, in response to a request for proposal, the on-line lottery contract for the Commonwealth of Puerto Rico.

Although SciGames' performance of the Puerto Rican lottery contract is about to begin, there have been recurring allegations in the press and from various legislative sources that the contract was procured on the basis of questionable or illegal conduct of SciGames' representatives or its agents. These allegations continue to place SciGames' contract in jeopardy. Larry Potts, the vice president for security and compliance of Scientific Games Corporation, has been unable, despite diligent efforts, either to corroborate or to refute these allegations. Mr. Potts has found nothing to support any inference of any misconduct by any SciGames employee. He has advised me of this fact, and has reported the further curious result that he has been unable to uncover any evidence that Zurcaled or you on its behalf actually did anything, or were identified as having done anything, in connection with this procurement. There is understandable concern about the absence of any "footprints" involving Zurcaled International, Inc. and you.

It is of the highest importance to SciGames that, if at all possible, it put to rest the allegations of questionable or illegal conduct. It is also necessarily the case that you have personal knowledge of all of Zurcaled's activities in connection with the consulting agreement and the procurement process.

To the end of obtaining your cooperation and assistance with respect to these allegations of prior misconduct, we request that you make yourself available to be interviewed by Mr. Potts and our counsel, under oath and with a stenographic record.

Scientific Games Corporation
750 Lexington Avenue   New York, NY 10022   212.754.2233   Fax: 212.754.2372
www.scientificgames.com

Mr. Ernesto de la Cruz
March 3rd, 2005
Page 2

Your counsel would be invited to attend and would have the right, upon the conclusion of the SciGames' questioning, to ask questions of his own to clarify, amplify or explain anything he or you considered should be clarified or explained. It is our expectation that you would answer all questions truthfully and fully to the best of your ability.

For the sake of clarity, let me add that, as a matter of contract construction, we are of the opinion that Sections 6 and 16 of the consulting agreement contractually mandate the requested cooperation of Zurcaled and you on its behalf.

I have asked our outside counsel, David Olasov, of Brown Raysman Millstein Felder & Steiner, LLP to make appropriate arrangements with your counsel Alan Katz to set up a mutual convenient time and place for this interview. You are nevertheless welcome to call me if you have any questions.

Sincerely yours,

MES:sd

cc: Alan G. Katz, Esq.
✓ David M. Olasov, Esq.
Larry Potts



Exhibit J

# L R O W N R A Y S M A

BROWN RAYSMAN MILLSTEIN FELDER & STEINER LLP

David M. Olasov
212-895-2643
212-812-3335 Direct Fax
dolasov@brownraysman.com

April 6, 2005

*By Facsimile and By Federal Express*
Alan G. Katz, Esq.
Saretsky Katz Dranoff & Glass, LLP
331 Madison Avenue
New York, New York 10013

Re:     Zurcaled International, Inc. and Ernesto de la Cruz

Dear Mr. Katz:

I acknowledge your letter of March 21, 2005.

While you have indicated your client's willingness to respond under oath to certain inquiries, the conditions you set out in your letter are unacceptable. These conditions essentially mirror those you raised in our last telephone conversation in which you advised me that Mr. Katz was unwilling to meet with Larry Potts, Scientific Games' vice president for compliance and security, and counsel acting for Scientific Games Corporation if information concerning Zurcaled's contacts and intermediaries was to be sought. In particular, Mr. de la Cruz, through you, has disclosed the existence of two intermediaries, but has refused to identify them or to state what they or he did. On that basis you indicated that Mr. de la Cruz and you as his counsel would not appear on the date Mr. Potts, you and I had reserved for a meeting in New York.

As you may know, the Justice Department in its Letter Opinion Process, 04-02, and in pronouncements through its enforcement proceedings against ABB, Titan, InVision, Monsanto, and Micrus this year, clearly requires that companies exercise appropriate diligence in monitoring the activities of consultants such as your clients. These rules apply with equal force to public officials in the United States and its territories (See 18 U.S.C. Section 1346.) Scientific Games, as a provider of on-line lottery systems and other gaming services, is a highly regulated business. The purpose of our inquiry is not to obtain "confidential and proprietary business/trade secrets." Indeed, we might well be willing to provide assurances that the information provided will not be used in a commercial context with any third party. However, the refusal of Mr. de la Cruz to

Alan G. Katz, Esq.
April 6, 2005
Page 2

---

commercial context with any third party. However, the refusal of Mr. de la Cruz to identify those contacts he made and actions taken in connection with our client's business are unreasonable in these circumstances.

We have specific information suggesting that your clients entertained decision-makers and other officials in a manner that may or may not be linked to the award of the contract in question here. In response to your request we also identified two public sources of criticism of improper activities allegedly undertaken on behalf of Scientific Games by its representatives or consultants. There is no way that our client can pay your clients any monies that might be used to reimburse expenses of this sort or to satisfy promises of any sort to any such official under prevailing corporate governance and Justice Department pronouncements. Your clients' refusal to have an open dialogue on these topics only contributes to the problem.

In December 2003, our respective clients entered into an agreement that includes, among other provisions, an express condition in paragraph 16 of compliance with applicable anti-corruption laws. Press reports, scurrilous or otherwise, regarding allegations of potential misconduct by your clients in violation of that condition, coupled with their refusal to fully cooperate with the review being conducted by the Company's compliance department, and now by outside counsel, make it impossible for us not to advise our client that your clients are in breach of their agreement and thus entitled to nothing under the contract.

On Scientific Games' behalf, we hereby declare your clients in breach of contract. We invite your clients to reconsider their position so that our client's obligations of responsible contract oversight may be satisfied.

Sincerely yours,

David M. Olasov

cc:    Martin E. Schloss, Esq.
       Larry Potts

BRMFS1 574436v1

Exhibit K

# B R O W N R A Y S M A N

**BROWN RAYSMAN MILLSTEIN FELDER & STEINER**LLP

David M. Olasov
212-895-2643
212-812-3335 Direct Fax
dolasov@brownraysman.com

May 5, 2005

***By email and By FedEx***
Alan G. Katz, Esq.
Saretsky Katz Dranoff & Glass, LLP
331 Madison Avenue
New York, New York 10013

Re:     Zurcaled International, Inc. and Ernesto de la Cruz

Dear Mr. Katz:

While I had reached the conclusion that no purpose would be served by a further response to your letter of April 12, 2005, I have been directed by the Scientific Games Compliance Committee to ask you on what basis you made the following statements in your letter:

> "Moreover, you should be aware that Scientific Games had prior knowledge of the "boat trip" and authorized same even though, prior to the excursion, Scientific Games was on notice that the identity of the travelers would not be revealed.

While your client has refused, and as I understand it, continues to refuse to identify the "travelers," I have been asked to inquire which Scientific Games employee or employees "authorized" the excursion and acquiesced in your client's "notice" that "the identity of the travelers" would be withheld from Scientific Games. If any of these matters are evidenced by any contemporaneous writings, I have been directed to request copies.

Sincerely yours,

David M. Olasov

cc:     Martin E. Schloss, Esq.
        Larry Potts